*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

COURTNEY FROST,

UNPUBLISHED
June 22, 2023

Plaintiff-Appellant,

v

No. 362863
Washtenaw Circuit Court
JONATHAN FROST,
LC No. 20-000548-DC

Defendant-Appellee.

Before: GLEICHER, C.J., and RICK and MALDONADO, JJ.

PER CURIAM.

Since 2020, Jonathan Frost has repeatedly flouted court orders regarding his children's education and parenting time, unlawfully keeping his children away from their primary custodian and mother, Courtney Frost, for months at a time. In 2021, we peremptorily reversed a circuit court order entered without a hearing that permitted Jonathan to keep the oldest child, GF, enrolled in school in Jonathan's home state of Indiana, an action he had taken in violation of court orders. On remand, the circuit court made several errors in assessing the children's best interests and did not accurately use the factors affecting a motion for a change of domicile. Based on those errors, the court changed the children's domicile to be with their father.

We reverse the order changing the children's domicile and reinstate the children's domicile with Courtney. Jonathan is ordered to immediately return the children to Courtney's primary care. Courtney may enroll the children in school in the fall in her home district. The circuit court will need to revisit parenting time, but in the meantime, the parenting time order in the consent judgment of divorce will be in effect. Given the circuit court judge's continued failure to follow proper procedures to the detriment of these children, this matter must be reassigned on remand. In summary, we reverse the circuit court's August 17 and August 24, 2022 orders and remand for continued proceedings before a different jurist consistent with this opinion.

## I. BACKGROUND

Courtney and Jonathan Frost divorced in 2019 in Georgia. In a consent judgment of divorce, the parties agreed that Courtney would have primary custody of the couple's two children—GF (born in 2010) and ZF (born in 2018)—with Jonathan having parenting time one

weekend each month. Although the parents shared joint legal custody, the divorce judgment stated that in the event they could not reach an agreement, Courtney had authority to make the final decision.

Before the divorce was finalized, Jonathan moved to Indiana. Two months later and after the judgment entered, Courtney relocated to Ypsilanti. Courtney chose her destination because Jonathan's family lived in that area, the children would be closer to their father, and she found employment with an $85,000 annual salary. After this move, Courtney agreed to additional parenting time for Jonathan. Each parent drove one way to facilitate these visits.

This somewhat amicable relationship ended in February 2020. Jonathan surmised that his remarriage angered Courtney. At the end of February 2020, Jonathan drove to Ypsilanti to begin his parenting time. He picked ZF up from daycare and then drove to GF's school. Courtney had picked up GF and would not allow him to go with Jonathan. The police were summoned to mediate the dispute. Ultimately, Jonathan returned to Indiana with just ZF. At the evidentiary hearing, Jonathan claimed that the pandemic struck before he could return ZF and that he and Courtney agreed he should keep her until the stay-at-home order lifted.[1] Courtney testified that she drove to Jonathan's home on the final day of the weekend parenting-time session and he refused to return ZF to her care. The police were summoned and Courtney showed them the Georgia divorce judgment, but the police did not order Jonathan to turn over ZF. Jonathan returned ZF to Courtney 45 days later. In the meantime, Courtney filed an action in Washtenaw Circuit Court to register the Georgia divorce judgment.

In September 2020, Jonathan relocated to Ypsilanti to be closer to the children. At that time, the parties stipulated to a "3-2-3-2" parenting-time split, where the children would remain with Courtney for three consecutive days and Jonathan two. Parenting-time exchanges during this period were tense. Courtney accused Jonathan of intimidating her and on one occasion, lifting her up by her coat collar and pushing her backward. Courtney summoned the police, but they found inadequate evidence to make an arrest. This parenting-time arrangement did not last long, however, as Jonathan relocated to Indiana again in March 2021.

The children went to stay with Jonathan during spring break in 2021. Jonathan enrolled GF in school in Indiana during that visit and refused to release the children to Courtney thereafter. Courtney responded with an emergency motion in the circuit court. The parties then agreed that Courtney would exercise eight weeks of makeup parenting time in the summer of 2021, ending August 7. The order provided that after August 7, "the parties shall continue with the regular parenting time schedule until further order of the Court," and that the children could not "reside outside Michigan without prior approval of the court." Despite these clear instructions, Jonathan

---

[1] We take judicial notice that a state of emergency was not declared in Indiana until March 6, 2020, several days after the end of Jonathan's parenting time, and Indiana's stay-at-home order did not enter until March 23. See Indiana Executive Order 20-08, available at <https://www.in.gov/gov/files/Executive_Order_20-08_Stay_at_Home.pdf> (accessed May 31, 2023).

refused to return the children to Courtney at the end of his August 2021 parenting time and again enrolled GF in an Indiana school.

Courtney travelled to Indiana and presented court documents to take GF out of school. She again sought court intervention. Without conducting a hearing, Washtenaw Circuit Court Judge Patrick Conlin ordered that GF would attend school in Indiana in Fall 2021 to avoid further disruption. The court ordered that both children would remain in Jonathan's care during the week and would spend several weekends with Courtney. The court indicated that the issue could be revisited before the start of the second semester.

This Court granted Courtney's delayed application for leave to appeal, granted her motion for immediate consideration, and peremptorily reversed the circuit court's order.[2] On remand, the circuit court was ordered to conduct

> an expedited evidentiary hearing and resolution of the parties' custody, parenting time, and school of choice issues. The trial court committed clear legal errors on several major issues when it modified the physical and legal custody and parenting time provisions of the divorce judgment without an evidentiary hearing and without following the rubrics detailed in *Pierron v Pierron*, 486 Mich 81; 782 NW2d 480 (2010); *Rains v Rains*, 301 Mich App 313; 836 NW2d 709 (2013); *Lombardo v Lombardo*, 202 Mich App 151; 507 NW2d 788 (1993); and *Grew v Knox*, 265 Mich App 333; 694 NW2d 772 (2005). The provisions of the divorce judgment control unless and until the trial court modifies those provisions after a proper assessment of the merits of the parties' positions. [*Frost v Frost*, unpublished order of the Court of Appeals, entered October 19, 2021 (Docket No. 358553).]

Immediately upon entry of this Court's order, Courtney filed an emergency motion seeking the return of the children to her primary physical custody as provided in the reinstated Georgia divorce judgment. The circuit court returned the children to Courtney's primary custody on October 27. As GF had been bullied at his old school in Michigan, Courtney enrolled him in a charter academy.

The evidentiary hearing ordered on remand began on December 2, 2021. On the first day, Jonathan testified that GF had been threatened at his Ypsilanti school and wanted to stay in Indiana. He also painted a picture in which Courtney manipulated the system and falsely accused him of violence. He testified that Courtney repeatedly called the police to his home for welfare checks and to monitor their parenting-time exchanges. At the end of that day's testimony, the parties agreed to attempt mediation. During the 2021 winter break, however, Jonathan refused to return the children to Courtney at the end of his parenting time. Courtney filed a motion to show cause, and the circuit court indicated it would take the matter under advisement. The children were returned to Courtney in time to start school in Michigan.

Mediation was not fruitful and the evidentiary hearing continued via Zoom on April 21, 2022. Judge Conlin adjourned the proceeding so it could be held in person, facilitating his assessment of the credibility of the witnesses. The court again took under advisement Courtney's

---

[2] Courtney first filed a claim of appeal, which was dismissed for lack of jurisdiction.

show cause motion and Jonathan's new request to expand his parenting time. Despite the urgent nature of these proceedings, the in-person hearing did not occur until June.

At the continued hearing, the parties testified regarding their disagreement over GF's religion. Courtney testified that GF was baptized at the age of nine in a nondenominational Christian church. Jonathan asserted that he was a Hebrew Israelite and needed to mentor GF in preparation for his bar mitzvah at age 15. Courtney described Jonathan's aggressive behavior toward her since the divorce. She further described that Jonathan had always been too aggressive with the children, employing corporal punishment beyond her comfort.[3] Courtney testified that even when GF attended school in Indiana, she kept in regular contact with his teacher. Courtney presented evidence of a text message from Jonathan ordering her to stop communication with the teacher, stating that he alone should be in contact with the Indiana school. Jonathan admitted that when GF attended school in Michigan, he had no contact with the teacher and took no part in school events because he did not agree that GF should attend there. Once the children were returned to Courtney's care, she enrolled GF in a new school that was "higher performing" than his previous school. Jonathan also admitted that he could not name any of the children's medical care providers and had attended only one visit with GF since the divorce.

The circuit court issued its opinion on August 17, 2022, two months after the hearing ended. The court found that the parties' moves were a material change in circumstances justifying review of the parenting time order. The court further determined that the children had an established custodial environment with both parents, created "both by consent and later by withholding exchange." As Jonathan sought to change that established custodial environment through his requested change in parenting time, Jonathan bore the burden of proving by a preponderance of the evidence that the change would be in the children's best interests.

In analyzing the factors of MCL 722.23, the court acknowledged that Jonathan had played fast and loose with court orders and had withheld the children during exchanges. However, the court also faulted Courtney for summoning police during exchanges and to conduct welfare checks on the children. Ultimately, the court found that Jonathan had met his burden.

The court then considered the factors of MCL 722.27a in determining how to schedule parenting time in the best interests of the children given the physical distance between their parents' homes. Finally, the court considered the factors of MCL 722.31(4) to determine whether changing the children's domicile to Indiana was permitted. The court again found that Jonathan had met his burden.

At the conclusion of its analysis, the court maintained joint legal custody but changed the children's domicile to their father's home in Indiana. The court permitted the children to be enrolled in school in Indiana. The court awarded Courtney one weekend each month of parenting time, plus school holidays and the entire summer.

---

[3] Although Courtney did not disapprove of spanking, she believed Jonathan inappropriately "thump[ed]" the children on the head and once smacked GF.

Courtney appeals.

## II. STANDARDS OF REVIEW

The purpose of the Child Custody Act (CCA), MCL 722.21 *et seq.* is "to promote the best interests of the child and to provide a stable environment for children that is free of unwarranted custody changes." *Pennington v Pennington*, 329 Mich App 562, 570-571; 944 NW2d 131 (2019) (quotation marks and citation omitted). Under the CCA, " 'all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue.' MCL 722.28." *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010). A factual finding is against the great weight of the evidence when the evidence "clearly preponderates in the opposite direction." *Id*. (cleaned up).

When asked to consider a change of custody, domicile, or parenting time, a court's first duty is to determine whether a change is in the children's best interests based on "proper cause or a change in circumstances." *Pennington*, 329 Mich App at 571. If there is proper cause or a change of circumstances warranting reconsideration of the standing custody orders, the court must then "consider whether the proposed change would modify the established custodial environment. The established custodial environment is the environment in which over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." *Pierron*, 486 Mich at 85-86 (quotation marks and citation omitted). To alter a child's established custodial environment, the petitioning parent must present "clear and convincing evidence that it is in the best interests of the child." *Id*. at 86.

We review "for an abuse of discretion a trial court's ultimate decision whether to grant a motion for change of domicile." *Sulaica v Rometty*, 308 Mich App 568, 577; 866 NW2d 838 (2014). In the context of a custody case, "an abuse of discretion exists when the result is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Id*. A court's first step in considering a change of domicile request is to consider the factors enumerated in MCL 722.31(4). If the factors support a change in domicile, the court must then determine the child's established custodial environment and whether the domicile change would alter that environment. If so, the court must consider whether the change is in the child's best interests under the MCL 722.23 factors. *Rains v Rains*, 301 Mich App 313, 325; 836 NW2d 709 (2013). The analysis of a parenting-time or custody change motion is substantially similar to the analysis of a change of domicile request, just taken in a different order.

## III. ANALYSIS

When this case was initiated in Michigan, the standing court order regarding custody and parenting time was the 2019 Georgia judgment of divorce. That judgment provided for Courtney to have final say on decisions affecting the children when the parties could not agree. The judgment also provided for Jonathan to have only one weekend of visitation each month, likely because the parties lived approximately 650 miles apart at that time. The circuit court correctly determined that circumstances had changed warranting reconsideration of that order. Specifically,

Courtney moved to Michigan, putting the parents approximately 250 miles apart and easing parenting-time exchanges.

We also discern no error in the court's conclusion that the children have an established custodial environment with both parents. Since November 2019, the children have spent varying lengths of time with both parents. Some of Jonathan's lengthier stretches with the children were the result of his refusal to turn the children over at the end of his parenting time. However, "[a] custodial environment can be established as a result of a temporary custody order, in violation of a custody order, or in the absence of a custody order." *Berger v Berger*, 277 Mich App 700, 707; 747 NW2d 336 (2008).

Yet, the circuit court made several factual findings against the great weight of the evidence in assessing the factors of MCL 722.23.

MCL 722.23 provides that under the CCA, the " 'best interests of the child' means the sum total" of 22 factors that must "be considered, evaluated, and determined by the court." Factor (a) is "[t]he love, affection, and other emotional ties existing between the parties involved and the child." The court found the parties equal under this factor as both shared loving relationships with the children. We discern no ground to interfere with that finding.

Factor (b) relates to "[t]he capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." Although there was evidence that Jonathan had potentially altered his religious beliefs in recent years, the evidence supports the circuit court's conclusion that the parties were equally capable of guiding the children in that regard.

Factor (c) pertains to "[t]he capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." The court erred in stating that both parties were employed. Jonathan stated that he was unemployed and collected veteran's and social security disability benefits. However, the evidence does support that both parties able to provide for the children.

Factor (d) is "[t]he length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity." The court found both parties lacking in this regard. Jonathan moved from Georgia to Indiana before the parties' divorce was even final, despite that he claimed to have been the children's primary caregiver during the marriage. The court found that "[n]either parent has handled these moves with the children's best interests at heart." However, the evidence clearly shows that Courtney moved to Michigan two months after Jonathan's move to be closer to him and his relatives, and to make parenting-time exchanges a little easier. At some point, Courtney changed residences, but remained in the same school district and near the children's extended family. Jonathan, on the other hand, appears to have lived in three different residences in Indiana and one in Michigan during this same time period. There simply is no evidence that Courtney's moves were not handled in the best interests of the children.

Also relevant to considering the stability and quality of a home environment are the other members of that household. Jonathan provided no information regarding his wife or her minor

children living in the household. There is no evidence regarding GF's and ZF's relationship with these individuals. This hole in the evidence made it difficult to assess whether the home environment is "satisfactory" or "the desirability of maintaining" its continuity. Ultimately, the circuit court's finding that this factor weighed against Courtney is against the great weight of the evidence.

Factor (e) relates to "[t]he permanence, as a family unit, of the existing or proposed custodial home or homes." The circuit court found that this factor favored each party equally, again with no consideration of the fact that other individuals live in Jonathan's home. Absent this vital evidence, we cannot affirm the court's conclusion that this factor weighed equally in favor of both parents.

Factor (f) relates to "[t]he moral fitness of the parties involved." The court found that this factor disfavored both parties equally, stating:

> This factor is troubling to both parties. There were allegations of poor choices against both parents. And much testimony to support that the parents acted in ways to "get the other parent in trouble." It is not clear whether this is a lacking in moral fitness, or an immaturity that renders each parent temporarily a person utterly lacking in sound parental decision making.

The court's findings in this regard are equally "troubling." It may well be that Courtney sometimes summoned police unnecessarily. However, the court disregarded that Courtney requested the assistance of Indiana police when Jonathan intentionally withheld the children beyond his parenting time, and was denied that assistance despite that she presented the divorce judgment establishing her rights. She also summoned police to conduct welfare checks when Jonathan wrongfully withheld the children and would not let her communicate with them. The circuit court was shockingly harsh on this parent for trying to prevent the parental kidnapping of her children. The court's assessment of the parties' assessment on this factor went against the great weight of the evidence.

Factor (g) addresses "[t]he mental and physical health of the parties involved." The evidence supports that Courtney is in good health, but that Jonathan suffers from several physical and mental ailments as a result of his former military service. The evidence also supports that Jonathan has always tended to his children's needs without issue. Accordingly, we discern no error in the court's determination that this factor equally favored both parties.

Factor (h) relates to "[t]he home, school, and community record of the child." In this regard, the court found that this factor equally disfavored both parties as follows:

> The Court relies on its findings under factors (d) and (e). The Court will note the testimony of the counselor from the school in Indiana who advised [Courtney] to at least wait until the end of the school day to take [GF] from the school to Michigan. [Courtney] agreed to the counselor's face, then removed the child from the school grounds, implying that she was concerned about interference from [Jonathan]. Her abrupt removal of her son had the (now obvious) effect of removing the child from school without giving him a moment to even say goodbye

to friends or teachers. While [Courtney] may have had reason to act abruptly from her perspective, it is this type of situation that illustrates how the discord between the parties has devastating effects on the minor children. On the other side, [Jonathan] has gone to [ZF's] daycare center to remove her and that rushed incident (almost a chase scene from the movies) led to [Jonathan] being accused of kidnapping and handcuffed in front of the minor children by law enforcement. Again, this illustrates a complete disregard or unawareness of how the adult behavior leads to indelible traumatic memories for the children.

There is a fundamental flaw underlying the court's assessment of this factor. The 2019 divorce judgment gave the parties joint legal custody but authorized Courtney to make the final decision when the parties could not agree on certain issues.

Problems first arose in February 2020. Jonathan rejected Courtney's requests to meet halfway for a parenting-time exchange. Without notifying Courtney, he drove from Indiana and pulled ZF from daycare. He then travelled to GF's school to remove him. Courtney was already on site for a school meeting and intercepted Jonathan from taking GF as well. Jonathan pulled away with ZF and called the police, while Courtney travelled to a day care center where GF attended an after-school program. Courtney accused Jonathan of kidnapping and the police placed him in handcuffs. The police ultimately did not arrest Jonathan. But they also could not convince Jonathan to turn ZF over to her mother's care. Jonathan returned to Indiana with ZF. He refused to return ZF to Courtney when she travelled to Indiana at the end of his parenting time and withheld her against the judgment of divorce for 45 days. It was at that time that Courtney first sought the assistance of the courts in Michigan.

Courtney and Jonathan disagreed on where GF should attend school. According to the judgment of divorce, therefore, Courtney alone would resolve the issue. As she was the children's primary custodian, she enrolled GF in school near the home she shared with the children. Jonathan violated the divorce judgment by withholding custody of the children in the spring of 2021 and unilaterally changing GF's school. As that school was four hours away from Courtney's home, Jonathan also forced a change in custody. This was an act of parental kidnapping as defined by MCL 750.350a(1) ("An adoptive or natural parent of a child shall not take that child, or retain that child for more than 24 hours, with the intent to detain or conceal the child from any other parent or legal guardian of the child who has custody or parenting time rights under a lawful court order at the time of the taking or retention . . . ."). The circuit court rewarded Jonathan for his illegal behavior by allowing GF to remain enrolled in the Indiana school for the remainder of 2021 spring semester.

Jonathan's disregard for the law and court orders did not stop there. As a result of Jonathan withholding custody of the children, the court entered a stipulated order awarding Courtney eight weeks of summer makeup parenting time. The court order specifically stated that at the end of that term, the existing parenting-time schedule would be resurrected and that the children could not be moved out of Michigan without a prior court order. That order could not be clearer— Jonathan could not move the children to Indiana without a court order. Jonathan violated that order by again withholding the children at the end of his parenting time in August 2021 and re-enrolling GF in an Indiana school. Courtney travelled to Indiana with the court order to remove GF from the school that he unlawfully had been enrolled in. While the school social worker

recommended waiting to withdraw GF until the end of the day, Courtney reasonably determined that this was not a safe option. Without conducting a hearing, and despite that the Michigan school year had not yet started, the circuit court determined that Jonathan would maintain custody of the children for the Fall 2021 semester and that GF would attend the Indiana school to avoid further disruption. This Court peremptorily reversed that decision and the children were returned to Courtney's care in late October 2021.

Every disruption in GF's education was caused by Jonathan violating court orders to unilaterally alter the children's custody arrangement and enroll GF in school four hours away from the child's legal domicile with his mother. The circuit court twice enabled Jonathan's illegal behavior—once in the spring of 2021 and again in August 2021. And yet the court held against Courtney her actions to protect her children from being unlawfully taken. This was an egregious error that must be corrected. This favor clearly weighed heavily in Courtney's favor.

Factor (i) gauges the reasonable preference of a child who is old enough to express a preference. The court implied that GF expressed a desire to live with his father and attend school in Indiana when it indicated that it gave GF's "preference significant weight." Although a child may have a strong preference to live with one parent over the other, that preference does not always align with his or her best interest.

Factor (j) relates to "[t]he willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents." The court determined that this factor weighed in Jonathan's favor as follows:

> At [some] point in time, the parties reached a consent judgment of divorce and reached agreements on custody and parenting time. [Jonathan] testified that he was either coerced into signing the Georgia Judgment of Divorce/mediation agreement. Whether he was clear on what or why he was signing, [Jonathan] did sign the agreement which was adopted into the judgment. He did not seek to set that aside in Georgia and this Court cannot re-evaluate [Jonathan's] state of mind from that period. [Courtney] moved to Michigan after [Jonathan] moved to Indiana. At this point in time, parenting time between the parties was fluid. It is the Court's belief that [Jonathan's] remarriage caused the present strife between the parties. The Court notes that after his remarriage, [Jonathan] moved to Michigan in an attempt to recreate a more harmonious, fluid co-parenting relationship. [Jonathan] was recently married in Indiana but left his wife to attempt this parenting time accord, but to no avail. The parties have consistently been in Court on various motions on parenting time.

We agree with the circuit court that Jonathan's decision to move to Michigan for approximately four months in an attempt to improve the coparenting arrangement was admirable but ultimately unsuccessful. The record reveals that Courtney may not have been innocent in the battles. However, the circuit court neglected to consider that Jonathan repeatedly withheld the children beyond his allowed parenting time, interfering with the mother-child relationship. Jonathan withheld ZF beginning in February 2020 for 45 days. Jonathan then refused to return to the children to Courtney's care at the end of his parenting time in April 2021 and unilaterally

-9-

changed GF's school. He defied a court order and repeated this same action in August 2021. There is no evidence that Courtney ever withheld the children for any extended period of time or against a court order. Similarly, Jonathan never challenged Courtney's testimony that she permitted Jonathan contact with the children while in her care, while Jonathan prevented her from directly communicating with the children when he had unlawfully withheld them outside of his parenting time. The court's assessment that this factor weighed in Jonathan's favor goes against the great weight of the evidence.

Factor (k) takes into consideration "[d]omestic violence, regardless of whether the violence was directed against or witnessed by the child." Courtney described Jonathan as aggressive and intimidating. She testified that on one occasion and in front of the children, Jonathan picked her up by her coat collar and forcibly put her down, causing her to stumble backward. During that encounter, Courtney alleged, Jonathan threatened to "fuck her up." This assault arose over Courtney deciding to remove polish from three-year-old ZF's fingernails. Courtney called the police but the responding officer determined that there was inadequate evidence to make an arrest.

The circuit court gave no weight to factor (k). It stated, "[w]ithout corroborating evidence or an arrest for domestic violence, the Court is left to determine the credibility between these parties and their versions of the historic event." The court found both parties to be "fairly generous with facts and interpretation of court orders." Accordingly, it was "difficult to give one party's testimony on this subject greater weight or credibility." We note that there is no record evidence that Courtney misinterpreted court orders. However, we agree that this particular occurrence was a pure credibility contest and we will not interfere with the court's assessment in this regard.

Finally, a court may take other relevant factors into consideration under the catchall factor (*l*). The court found this factor irrelevant.

Ultimately, the court made several factual findings against the great weight of the evidence, which skewed its analysis of the best-interest factors. Based on that skewed analysis, the circuit court found that a modification of parenting time was in the children's best interests. The court stated that factor (j) was "of particular significance . . . as it relates to the hope of any lessening or cessation of conflict between the parents." The court found Courtney "mostly credible" but with a "capacity for manipulation." It described Jonathan as "mostly credible" but with a "capacity for intimidation and intentional misinterpretation of court processes and more recently court ordered parenting time schedules." The court noted that both parties passed the blame. Unfortunately, the court continued to minimize Jonathan's kidnapping of the children and vilifying Courtney's attempts to stop it.

Before setting a parenting-time schedule, the circuit court turned to MCL 722.27a. MCL 722.27a(7) identifies factors to consider "when determining the frequency, duration, and type of parenting time" to grant. The statute includes consideration of (f) "[w]hether a parent can reasonably be expected to exercise parenting time in accordance with the court order," and (h) "[t]he threatened or actual detention of the child with the intent to retain or conceal the child from the other parent or from a third person who has legal custody." Despite that Jonathan has repeatedly violated court orders and unlawfully kept the children beyond his parenting time, the court found these factors "not applicable." The record evidence abundantly supports that Jonathan is willing to ignore court orders and play keep away with the children. The entire parenting-time

order was based on the fundamentally erroneous notion that Jonathan would complacently turn the children over to Courtney for her parenting time.

The circuit court then turned to assessing the factors relevant to a change of domicile motion under MCL 722.31(4). In pertinent part, MCL 722.31 provides:

> (1) A child whose parental custody is governed by court order has, for the purposes of this section, a legal residence with each parent. Except as otherwise provided in this section, a parent of a child whose custody is governed by court order shall not change a legal residence of the child to a location that is more than 100 miles from the child's legal residence at the time of the commencement of the action in which the order is issued.

> * * *

> (4) Before permitting a legal residence change otherwise restricted by subsection (1), the court shall consider each of the following factors, with the child as the primary focus in the court's deliberations:

> (a) Whether the legal residence change has the capacity to improve the quality of life for both the child and the relocating parent.

> (b) The degree to which each parent has complied with, and utilized his or her time under, a court order governing parenting time with the child, and whether the parent's plan to change the child's legal residence is inspired by that parent's desire to defeat or frustrate the parenting time schedule.

> (c) The degree to which the court is satisfied that, if the court permits the legal residence change, it is possible to order a modification of the parenting time schedule and other arrangements governing the child's schedule in a manner that can provide an adequate basis for preserving and fostering the parental relationship between the child and each parent; and whether each parent is likely to comply with the modification.

> (d) The extent to which the parent opposing the legal residence change is motivated by a desire to secure a financial advantage with respect to a support obligation.

> (e) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

"MCL 722.31(4) requires the trial court to consider" these factors when a parent requests to move the children, "keeping the child as the primary focus." *Rains*, 301 Mich App at 326. Under these factors, the moving party must "demonstrate by a preponderance of the evidence that the four factors favored a change of domicile." *Id*. at 330. "It is only *after* the trial court determines that the moving party has shown by a preponderance of the evidence that a change of domicile is warranted that the trial court must determine whether an established custodial environment exists."

-11-

*Id.* at 327. The court must then "determine whether the change in domicile would cause a change in the established custodial environment." *Id.* at 328. Only after these considerations are taken does the court consider whether the moving party has proven "by clear and convincing evidence that the change is in the child's best interests." *Id.*

The circuit court erred by weighing the MCL 722.31(4) factors in favor of one parent over the other instead of in favor of retaining or changing domicile. Under factor (a), the court stated:

> [Courtney] has the more stable employment with potential for economic stability and growth, yet she is obligated to work longer hours and have the children in more day care. [Jonathan] claims disability income and has a less stable home environment (having moved more than once in Indiana), yet has more time to be with the children without the need of outside day care.

However, MCL 722.31(4)(a) requires the court to consider whether the proposed "change has the *capacity to improve the quality of life* for both the child and the relocating parent." (Emphasis added.) The court made no determination that changing the children's domicile to Indiana would in any way improve their life. The court simply stated, "Both parties are equally favored under this factor."

Under factor (b), the court reasoned:

> Both parties have unilaterally interfered with parenting time. [Courtney] stopped an exchange by accusing [Jonathan] of kidnapping. [Jonathan] has a history of denying the return of the children through questionable interpretations of prior Court Orders. The testimony of the parties demonstrates that both of them have agreed to changes, compromised and then withdrawn prior agreements and blamed the other party.

The court found, "Both parties are equally favored and disfavored under this factor." Again, the court did not consider whether the parties' compliance with parenting-time orders weighed in favor or against changing the domicile. Again, the court treated this analysis like an assessment of the best-interest factors. And again, the court treated Courtney's one potential instance of withholding the children for one day as similar to Jonathan's repeated unlawful withholding of the children for months at a time.

Similarly, under factor (c), the court questioned whether either parent could "make the 'best' of the resulting situation" "[w]ith adherence to the schedule or openness to communication and modification where necessary for the children's true best interests." While the court improperly analyzed this factor, it also failed to acknowledge uncontradicted evidence that Jonathan did not allow Courtney direct contact with her children during the expanses of time that he wrongfully withheld them.

Ultimately, given the inaccurate procedural framework employed by the court and the unsupported factual findings it relied upon, the order changing the children's domicile to Indiana must be reversed. As already noted, the court correctly determined that the children had an established custodial environment with both parents. The change of domicile altered that

established custodial environment, giving Courtney very limited parenting time for the first time. To make that alteration, the court had to find the change to be in the children's best interests. And as extensively discussed, the court's best-interest analysis was completely unsupported.

We reverse the order changing the children's domicile and reinstate the children's domicile with Courtney. Jonathan is ordered to immediately return the children to Courtney's primary care. Courtney may enroll the children for school in the fall in her home district. The circuit court will need to revisit parenting time, but in the meantime, the parenting time order in the consent judgment of divorce will be in effect. Given the circuit court judge's continued failure to follow proper procedures to the detriment of these children, this matter must be reassigned on remand.

We reverse the circuit court's August 17 and August 24, 2022 orders and remand for continued proceedings consistent with this opinion. We do not retain jurisdiction.


/s/ Elizabeth L. Gleicher
/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado